# NO. 12-20-00276-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE* |
| *T.A., Z.B.M., D.S.B., E.M. & B.M.,* | § | *COUNTY COURT AT LAW NO. 2* |
| *CHILDREN* | § | *ANGELINA COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

R.A., D.H.B., Jr., and N.A. appeal the termination of their parental rights. In five issues each, R.A. and D.H.B., Jr. challenge the legal and factual sufficiency of the evidence to support the termination order. N.A. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination was in the best interest of the child. We affirm in part and reverse in part.

## BACKGROUND

R.A. is the mother of T.A., Z.B.M., D.S.B., E.M., and B.M. The father of T.A. is N.A., the father of Z.B.M. is Z.W.[1], the father of D.S.B. and B.M. is D.H.B., Jr., and the father of E.M.[2] is M.H. On January 29, 2019, the Department of Family and Protective Services (the Department) filed an original petition for protection of T.A., Z.B.M., D.S.B., E.M., and B.M., for conservatorship, and for termination of R.A.'s, N.A.'s, and D.H.B., Jr.'s parental rights. The Department was appointed temporary managing conservator of the children, and R.A., N.A., and D.H.B., Jr. were allowed limited access to and possession of the children.

---

[1] In the final order in suit affecting the parent-child relationship, the trial court appointed the nonparent, B.J.W., as permanent managing conservator of Z.B.M., and the father, Z.W., as possessory conservator of the child. Z.W. is not a party to this appeal.

[2] In the final order in suit affecting the parent-child relationship, the trial court appointed the Department as permanent managing conservator of E.M., and the father, M.H., as possessory conservator of the child. M.H. is not a party to this appeal.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that R.A. engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between R.A., T.A., Z.B.M., D.S.B., E.M., and B.M. is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between R.A., T.A., Z.B.M., D.S.B., E.M., and B.M. be terminated.

Further, the trial court found, by clear and convincing evidence, that N.A. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), and (O) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between N.A. and T.A. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between N.A. and T.A. be terminated.

Finally, the trial court found, by clear and convincing evidence, that D.H.B., Jr. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), (N), and (O) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between D.H.B., Jr., D.S.B., and B.M. is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between D.H.B., Jr., D.S.B., and B.M. be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2020); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have

2

engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2020); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2020); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

**STANDARD OF REVIEW**

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a

3

reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## R.A.'s TERMINATION UNDER SECTIONS 16.001(b)(D) and (E)

In her first and second issues, R.A. argues the evidence is legally and factually insufficient to terminate her parental rights pursuant to subsections (D) and (E) of Texas Family Code Section 161.001(b)(1).

**Applicable Law**

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West Supp. 2020). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West Supp. 2020). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at

200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. *Ybarra*, 869 S.W.2d at 577-78. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *In re N.R.*, 101 S.W.3d at 776. In other words, conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We have previously concluded it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, is not inherently a part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (D) is designed to protect a child from precisely such an environment. *Id*.

Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include

the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also **In re M.N.G.**,* 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur before the child's birth and both before and after the child has been removed by the Department. ***Walker v. Tex. Dep't of Family & Protective Srvs.***, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A parent's use of narcotics and its effect on her ability to parent may qualify as an endangering course of conduct. ***In re J.O.A.***, 283 S.W.3d 336, 345 (Tex. 2009); *see also **In re R.W.**,* 129 S.W.3d at 739. Further, evidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being. *See **In re M.E.-M.N.**,* 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); ***Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.***, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). ***Walker***, 312 S.W.3d at 617-18. A parent's drug use both before and after a child's birth is relevant to the issue of endangerment. ***Dupree v. Tex. Dep't of Protective & Regulatory Servs.***, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs. ***In re C.R.***, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.); ***In re C.A.B.***, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

## Analysis

This case began when R.A. went to the hospital on January 5, 2019 to give birth to B.M. R.A. tested positive for amphetamine and methamphetamine, and B.M. tested positive for methamphetamine. R.A. admitted to the Department's investigator that she used methamphetamine on January 2, 2019. The other four children were tested and E.M. tested positive for drugs. At that point, all the children were removed from R.A.

*Prior Department Cases.*

R.A. was involved in multiple cases with the Department and Pam Clifton, the Department's caseworker, stated that R.A.'s Department history involved abuse and neglect. The most recent prior case began in April 2016 and the report alleged neglectful supervision by R.A. and medical concerns involving Z.B.M. According to Clifton, R.A. tested positive for methamphetamine. R.A.'s previous case from 2016 ended in May 2018, only eight months before the current case.

In 2015, allegations of neglectful supervision and physical abuse of T.A. by a maternal grandparent were determined to be "reason to believe." In 2014, allegations of physical abuse of Z.B.M. by Z.W., his father, were found to be "unable to determine." During the same investigation, allegations of physical abuse of Z.B.M. by another party were found to be "reason to believe." In 2013, allegations of physical abuse of T.A. by R.A. were "ruled out." There was also an allegation of drug use by R.A. The cases in 2013, 2014, and 2015 involved people with whom R.A. left the children, including the children's grandparents and R.A.'s cousins.

*Drug Use.*

According to Clifton, R.A. had a methamphetamine addiction since at least April 2016. Clifton stated that R.A. tested positive for methamphetamine at least six times beginning in January 2019 and tested negative eight times. However, R.A. has not submitted to a hair follicle test since June 2019 even though Clifton requested that she do so. According to Clifton, hair follicle drug tests show drug use for a three month period while urinalyses only show drug use for twenty-four to forty-eight hours prior to the test. Most recently, R.A.'s urinalysis in September 2020 was negative but she refused, again, to submit to a hair follicle test. R.A. testified that she had not used drugs since May 2020. However, R.A. admitted that she provided a false drug test to her caseworker, having changed the date of the test. Clifton testified that she requested R.A. to submit to drug testing numerous times and R.A. was a "no show." According to Clifton, R.A.'s problem was drugs and she could not refrain from using them, having relapsed after the last case. Further, Shelly Traewick, the volunteer advocate for CASA, testified that R.A. had a drug problem and had enough time to "get off" drugs, but continued relapsing.

*Visitation.*

At the beginning of the case, the Department scheduled visitations between R.A. and the children. The visitations ceased because the caseworker was unable to locate R.A. Visitations

resumed after R.A.'s oral swab was clean on June 10, 2019. However, her next test on June 24, 2019 was positive for methamphetamine and amphetamine. R.A.'s visitations again ceased. Although her next two tests were clean, visitations with her children did not resume because N.A. was concerned about R.A.'s behavior during a visitation. Clifton asked R.A. to submit to drug testing again but she did not. As a result, R.A.'s continued positive drug tests or "no shows" affected her visitation with the children as the Department required two clean tests before she could resume or have visitation. At the time of trial, R.A. was allowed virtual visitations with her children and telephone visitations once a month. According to the caregivers and R.A., she has almost daily telephone contact with T.A., some telephone contact with Z.B.M., and "very" minimal contact with the three younger children. R.A. stated that she had not seen the children since May 2020.

*Violation of Visitation Plan.*

According to R.A., she had not been scheduled a visitation with her children since 2019. She admitted getting frustrated and learning that the children were upset and crying for her, including T.A. stating that she missed her, loved her, and wanted to go home. In the spring of 2020, without permission from the Department or two clean drug tests, R.A. began seeing her children with the permission of their caregivers. She testified that she knew she was not supposed to be visiting the children and that she was making a selfish decision. According to R.A., the children were happier, did not cry as much, and their grades improved after she began visiting them. R.A. stated that she was not using drugs. She saw T.A. and Z.B.M. every weekend and saw the younger three children every other weekend.

However, at one point, the Department became aware that R.A. was visiting the children and all the children and caregivers submitted to drug testing. According to Clifton's testimony at a permanency hearing, R.A. tested positive for methamphetamine, N.A., the father of T.A. and Z.B.M.'s caregiver, tested positive for methamphetamine, and the caregivers of the three youngest children tested positive for cocaine. Clifton stated that all five children tested positive for methamphetamine, and E.M. and B.M. also tested positive for cocaine. Further, she admitted that N.A.'s positive test was the result of exposure, not use. Clifton testified at trial that the children's positive tests could have come from exposure to R.A. or N.A.'s sister-in-law. R.A. believed the positive drug tests resulted from exposure to N.A.'s sister-in-law and the younger children's foster parent, both known drug users in the past. According to R.A., she tested

8

negative at that time and had been clean while visiting the children. The children were removed from their caregivers after submitting to drug testing.

*Service Plan.*

In order to obtain reunification of the children, Clifton testified that R.A. was requested to gain and maintain her sobriety, submit to random drug testing when requested, and undergo a psycho-social evaluation and follow all recommendations. She was required to undergo an evaluation at ADAC, follow all recommendations from the evaluation, complete parenting classes through ADAC and provide a certificate of completion, refrain from criminal activity, submit to individual counseling if recommended, and maintain stable employment and appropriate housing. According to Clifton, R.A. has not completed her psycho-social evaluation through Crossover Counseling even though Clifton approved an authorization for R.A. to complete a new assessment. R.A. completed some parenting classes through ADAC but has not provided a certificate of completion. However, R.A. missed appointments and even though there was an effort to reschedule her classes and counseling, she would "no show." She did not complete individual counseling.

R.A. completed several ADAC assessments but has not followed the recommendations, such as attending inpatient rehabilitation. Although R.A. reported that she attended rehabilitation several times, she never provided Clifton any documentation that she completed rehabilitation. According to Clifton, R.A. did not want to attend inpatient rehabilitation because she would lose her employment or house. R.A. participated in some extensive outpatient rehabilitation but the ADAC counselor recently informed Clifton that R.A. was being "unsuccessfully discharged."

According to R.A., she had a psychological evaluation at the Burke Center before the Department was involved in this case. She stated that she suffered from depression and anxiety but was not referred to any counseling services or prescribed any medication. R.A. stated she attended two inpatient rehabilitation centers but left each center after one to two weeks. She admitted that she was supposed to be in the centers for thirty days.

*Employment and Housing.*

R.A. was employed as a housekeeper at a hospital in 2019, was employed by Sanderson Farms in the latter part of 2019, and as a housekeeper at a Nacogdoches hospital in 2020. She stated that she has a home; however, Clifton has never been able to see the inside of the house. Clifton tried to visit R.A.'s home on two occasions but without success. According to Clifton,

R.A. has a home, a vehicle, and employment.

**Conclusion**

From the above evidence, a reasonable fact finder could have formed a firm belief or conviction that R.A. used drugs, relapsed after a previous case involving her drug use, was unable to visit her children because of her drug use, and continued to test positive for drugs or refuse to submit to drug testing. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The trial court could have also determined that R.A. did not complete her service plan and violated her service plan by continuing to use drugs and visiting the children without the Department's permission, resulting in the children testing positive for drugs. *See id.* Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that R.A. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well being of the children, and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well being of the children. *See In re J.F.C.*, 96 S.W.3d at 266.

Although R.A. had a vehicle and employment during this case, and argues that she did not allow the children to be endangered after her positive drug test in January 2019, this evidence is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that R.A. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well being of the children, and engaged in conduct, or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well being of the children. *See In re C.H.*, 89 S.W.3d at 25.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of R.A.'s parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b).  Accordingly, we overrule R.A.'s sole issue as to subsections (D) and (E) of Texas Family Code Section 161.001(b), and need not address termination under subsection (O). *See* TEX. R. APP. P. 47.1.

### D.H.B., JR.'S TERMINATION UNDER SECTION 16.001(b)(O)

In his fourth issue, D.H.B., Jr. argues the evidence is legally and factually insufficient to

terminate his parental rights pursuant to subsection (O) of Texas Family Code Section 161.001(b)(1).

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (West Supp. 2020). Texas courts generally take a strict approach to application of subsection (O). *In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.–Houston [1st Dist.] 2017, pet. denied) (quotations omitted).

Numerous courts have observed that subsection (O) does not "make a provision for excuses" for the parent's failure to comply with those requirements. *See, e.g.*, *In re S.Y.*, 435 S.W.3d 923, 928 (Tex. App.—Dallas 2014, no pet.); *In re C.M.C.*, 273 S.W.3d 862, 874–75 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.–Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.–Waco 2012, pet. denied); *G.H. v. Texas Dep't of Family & Protective Servs.*, No. 03-16-00157-CV, 2016 WL 4429945, at *4 (Tex. App.—Austin Aug. 17, 2016, pet. denied) (mem. op.). Further, "[c]ourts do not measure the 'quantity of failure' or 'degree of compliance'" with a court order. *In re S.J.R.-Z.*, 537 S.W.3d 677, 690 (Tex. App.—San Antonio 2017, pet. denied) (quoting *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.)). "A parent's failure to complete one requirement of [his] family service plan supports termination under subsection (O)." *In re D.D.R.*, No. 04-18-00585-CV, 2019 WL 360657, at *2 (Tex. App.—San Antonio Jan. 30, 2019, pet. denied) (mem. op.) (quoting *In re J.M.T.*, 519 S.W.3d at 267).

The burden of complying with a court order is on the parent, even if the parent is incarcerated. *Thompson v. Tex. Dep't of Family and Protective Srvs.*, 176 S.W.3d 121, 127 (Tex. App.—Houston [1st Dist.] 2004, pet. denied), *overruled on other grounds by Cervantes-Peterson*, 221 S.W.3d at 252 ("To require [the Department] to continually inquire as to a prisoner's efforts and accomplishments in regard to a service plan is not reasonable."); *see also In re B.L.D.–O.*, No. 13-16-00641-CV, 2017 WL 929486, at *4 (Tex. App.—Corpus Christi

Mar. 9, 2017, no pet.) (mem. op.); *In re M.R.*, No. 11-13-00029-CV, 2013 WL 3878584, at *6 (Tex. App.—Eastland July 25, 2013, no pet.) (mem. op.). In other words, incarceration is not a legal excuse or defense to a parent's failure to comply with a service-plan order. *See K.C. v. Tex. Dep't of Family & Protective Srvs.*, No. 03-17-00184-CV, 2017 WL 3585255, at *2 (Tex. App.—Austin Aug. 17, 2017, no pet.) (mem. op.). The factfinder may consider a parent's incarceration in determining compliance under subsection (O). *See In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014) ("[W]hether a parent has done enough under the family-service plan to defeat termination under subpart (O) is ordinarily a fact question.").

**Analysis**

In this case, although the Department alleged termination of D.H.B., Jr.'s parental rights to D.S.B. and B.M. were proper under several grounds, at the final hearing the Department stated that it would be proceeding only on the ground set forth in subsection (O) of Texas Family Code Section 161.001(b)(1). To terminate parental rights pursuant to subsection (O), the Department must show that: (1) the child was removed under Chapter 262 of the Texas Family Code for abuse or neglect; (2) the child has been in the permanent or temporary conservatorship of the Department for at least nine months; and (3) the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re V.A.G.*, No. 04-19-00449-CV, 2019 WL 5927451, at *2 (Tex. App.—San Antonio Nov. 13, 2019, no pet.) (mem. op.).

Here, D.H.B., Jr. does not challenge the elements that his children were removed for abuse or neglect or that his children were in the Department's care for at least nine months. He challenges the existence of a service plan prior to the commencement of the final trial. According to Clifton, D.H.B., Jr. had been in prison for the majority of the case. She stated that she did not know the date of his previous service plan, that it was created for him while he was in prison, and that it was mailed to him. Clifton stated that the former caseworker discovered some tasks that D.H.B., Jr. could complete while in prison, such as parenting classes, batterer's intervention classes, substance abuse classes, and trade or educational classes. Clifton testified that the Department asked D.H.B., Jr. to contact the Department within seventy-two (72) hours of his release from prison. The Department did not follow up with the penitentiary to determine if those tasks were available to D.B.H., Jr. or if he was on a waiting list. According to Clifton, D.H.B., Jr. was released from prison in December 2019 and did not contact her upon release.

However, Clifton admitted that D.H.B., Jr. violated his original service plan, not the amended service plan dated June 2020. Specifically, D.H.B., Jr. failed to contact Clifton within seventy-two (72) hours after his release from the penitentiary in December 2019. D.H.B., Jr. admitted that he did not contact the Department upon his release. He stated that he was never told what he was supposed to do when released from prison and did not know what kind of papers he received while in prison.

Subsection (O) first requires the existence of a valid, predicate court order that a parent has failed to comply with to obtain the return of the child. *See In re J.F.C.*, 96 S.W.3d at 278. A service plan must, among other things, (1) be specific; (2) state the goal of the plan, which may be the return of the child to the child's parents; and (3) state the actions and responsibilities necessary for the child's parents to take to achieve the plan goal. *See* TEX. FAM. CODE ANN. § 263.102 (West 2019). The trial court "shall incorporate the original and any amended service plan into the orders of the court." *Id*. § 263.106 (West 2019). Here, D.H.B., Jr.'s original family service plan was not admitted into evidence during trial and does not appear in the clerk's record filed in this appeal. Nor does D.H.B., Jr. recall receiving or signing his original service plan or knowing what was required by the original family service plan. *See In re B.L.H.*, No. 14-18-00087-CV, 2018 WL 3385119, at *7 (Tex. App.—Houston [14th Dist.] July 12, 2018, no pet.) (mem. op.) (finding that record contains sufficient evidence that Mother knew requirements of service plan, admitted receiving the service plan, and did not dispute that she signed it). Further, the trial court noted that D.H.B., Jr. was not served process in its permanency order on November 21, 2019, nor did he have appointed counsel until after that date.

From the record on appeal, the Department did not file the original service plan, it was never made an order of the court, D.H.B., Jr. never signed the original service plan, and thus, before the amended service plan filed in July 2020, there was no written order requiring him to comply with the court order specifically establishing the actions necessary for him to obtain return of his children. *See In re Q.W.J.*, No. 07-10-0075-CV, 2011 WL 3629195, at *9 (Tex. App.—Amarillo Aug. 18, 2011, no pet.) (mem. op.). Therefore, the Department failed to establish by clear and convincing evidence one of the essential elements under subsection (O) to support termination on that ground. *See In re B.L.R.P.*, 269 S.W.3d 707, 711 (Tex. App.—Amarillo 2008, no pet.) (declining to elevate the status of a family service plan to that of a court order).

We note that in its final order, the trial court found, by clear and convincing evidence, that D.H.B., Jr. also engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), and (N) of Texas Family Code Section 161.001(b)(1). Even if we did not conclude that the Department proceeded only on subsection (O), the result would not change.

Clifton testified that there had never been a removal of D.H.B., Jr.'s children that involved him. Nor had there been any allegations against him towards the children. She testified that R.A. and D.H.B., Jr. had a long history together and that D.H.B., Jr. was in the hospital with R.A. when E.M. was born. D.H.B., Jr. was in jail when B.M. was born, was released, and was in prison when the children were removed. At that time, he stated, he did not know that R.A. used methamphetamine or that she had a drug problem. R.A. testified that although D.H.B., Jr. had not "really" been around the children, he had done nothing wrong when he was around them. She admitted that D.H.B., Jr. hit her at one point, leaving bruises, but she lied to the Department about the incident, fearing it might ruin her case. D.H.B., Jr.'s sister, the foster parent for D.H.B., Jr.'s children, testified that she did not fear him and did not believe that he would harm the children. She had never known D.H.B., Jr. to use drugs.

Though imprisonment of a parent is insufficient, standing alone, to constitute "engaging in conduct which endangers the emotional or physical well-being of the child," it is a factor to consider on the issue of endangerment. *See Boyd*, 727 S.W.2d at 533–34; *In re M.D.S.*, 1 S.W.3d at 199. From the above evidence, we hold that the Department failed to establish by sufficiently clear and convincing evidence that D.H.B., Jr. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well being of the children, and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well being of the children. *See In re J.F.C.*, 96 S.W.3d at 266; TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The evidence only established that D.H.B., Jr. was in prison for the majority of the case, not that he endangered the children by his conduct or omissions.

And regarding Subsection (N), the court may order termination of the parent-child relationship if the parent constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department for not less than six months and (1) the Department made reasonable efforts to return the child to the parent, (2) the parent has not

regularly visited or maintained contact with the child, and (3) the parent demonstrated an inability to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N) (West 2020). The evidence must be sufficient to support each element set out in subsection (N), and the Department bears the burden of proof. *See In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *In re D.T.*, 34 S.W.3d at 633; *In re A.S.*, 261 S.W.3d 76, 90 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)).

As to the first element of subsection (N), implementation of a family service plan is ordinarily considered a reasonable effort by the Department to return a child to his or her parent. *In re N.K.T.*, No. 01-16-00439-CV, 2016 WL 6277415 at *7 (Tex. App.—Houston [1st Dist.] Oct. 27, 2016, no pet.) (mem. op.); *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.). In this case, as noted above, there was only an amended service plan in the record and that was created in June 2020, months after the first trial in this case. Moreover, Clifton testified that the Department has never tried to return the children to D.H.B., Jr. From the above evidence, we hold that the Department failed to establish by sufficiently clear and convincing evidence that D.H.B., Jr. constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department for not less than six months and the Department made reasonable efforts to return the children to the parent. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N); *In re A.L.H.*, 468 S.W.3d at 744.

**Conclusion**

We conclude the Department failed to establish by clear and convincing evidence one of the essential elements under subsection (O) to support termination on that ground. *See In re B.L.R.P.*, 269 S.W.3d at 711. Further, we conclude the Department failed to establish by clear and convincing evidence the elements under subsections (D), (E), and (N) to support termination on those grounds. Accordingly, we sustain D.H.B., Jr.'s first, second, third, and fourth issues regarding subsections (D), (E), (N), and (O) of Texas Family Code Section 161.001(b). Because we conclude that the Department failed to establish by clear and convincing evidence that D.H.B., Jr. engaged in one of the acts or omissions itemized in Texas Family Code 161.001(b)(1), specifically, subsections (D), (E), (N), and (O), we need not determine if termination was in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

**BEST INTERESTS OF THE CHILD**

In R.A.'s unnumbered fifth issue and N.A.'s sole issue, the parties argue the evidence is legally and factually insufficient to support a finding that termination of their parental rights is in the children's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. ***Holley v. Adams***, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned ***Holley*** factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or ***Holley*** factors in order to show that termination of parental rights is in a child's best interest. *See **Holley***, 544 S.W.2d at 372; ***In re J.I.T.P.***, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. ***In re D.M.***, 58 S.W.3d at 814. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest.

***In re M.R.J.M.***, 280 S.W.3d at 507. But the presence of scant evidence relevant to each factor will not support such a finding. ***Id.*** Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See **In re C.H.**,* 89 S.W.3d at 28-29. We apply the statutory and ***Holley*** factors below.

## Analysis Regarding R.A.

We note that R.A. continues to abuse drugs, tested positive numerous times, had numerous "no shows" for drug testing, did not complete her service plan, violated her visitation plan with her children, and had a long history with the Department. Clifton stated that R.A. loved her children and believed that T.A. and Z.B.M. would want to maintain a relationship with their mother. Traewick stated that T.A. and Z.B.M. want to be with R.A. and do not want her parental rights to be terminated. However, Clifton did not believe that the younger three children have much of an opinion regarding R.A.'s parental rights at the time of trial. The younger children's foster mother stated that the children do not ask about R.A.

Regarding the children, T.A. is placed with her paternal great-uncle and his wife and is doing great. She is happy, settling in well, attending counseling, and doing great in school. She is a very smart girl, told lies for her parents for a long time and struggles with it, and misses her parents. Z.B.M. is placed with his paternal great-grandmother, is struggling in school, and has some dyslexia-type issues. He is a very quiet child until he feels comfortable opening up. Z.B.M. is inseparable from, and bonded with, his great-grandmother.

D.S.B. and B.M. are placed with their paternal aunt. D.S.B. is in kindergarten and doing well. B.M. tested positive for methamphetamine at birth and suffered withdrawal. At the time of trial, B.M. was doing well and appeared to be developmentally on target. E.M. is also placed with the other children's paternal aunt and needs assistance from the early childhood intervention services for speech and mobility.

According to R.A., she is comfortable with T.A.'s placement and the younger three children's placement. However, she was not comfortable with Z.B.M.'s placement because she is not comfortable with Z.W., Z.B.M.'s father, being able to visit the child. R.A. stated that Z.W. was abusive and aggressive towards her, stating that he broke her jaw on one occasion while she was holding Z.B.M. Further, she admitted that D.H.B., Jr. hit her on the face, causing bruises. She lied to the Department about D.H.B., Jr.'s assault, stating that she did not tell the Department about the altercation because it might ruin her case. R.A. admitted to the trial court that at least

two of the fathers of her children assaulted her in a "fairly severe" manner. According to Clifton, R.A. is not a physical threat to the children as long as she is clean.

Clifton, the CASA supervisor, Traewick, and the attorney ad litem believed it was in the children's best interest for R.A.'s parental rights to the children be terminated. The CASA supervisor stated that R.A. did not follow ADAC's recommendations, has been noncompliant with random drug testing, did not complete her parenting classes, and has a history with the Department. Traewick recommended termination of R.A.'s parental rights because of her continuing drug problem. The attorney ad litem stated that R.A. did not complete her service plan and violated the Department's rules about visitation with her children who then tested positive for drugs.

*Conclusion.*

After viewing the evidence in the light most favorable to the trial court's best interest finding and applying the statutory and ***Holley*** factors, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of R.A.'s parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); ***In re J.F.C.***, 96 S.W.3d at 266. Although some evidence might weigh against the finding, such as the children's love for her and the older children's desire that her parental rights not be terminated, this evidence is not so significant that a reasonable fact finder could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating R.A.'s parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); ***In re J.F.C.***, 96 S.W.3d at 266. Accordingly, we overrule R.A.'s unnumbered fifth issue regarding best interest.

**Analysis Regarding N.A.**

In this case, N.A. is only contesting the trial court's order that termination of his parental rights to T.A. was in the child's best interest. In the first final hearing of this case, Clifton testified that N.A. was requested to maintain contact with the Department and care for the children in his home, T.A. and Z.B.M. She stated that he had a stable home and she had no concerns about his ability to care for the children. Clifton also stated that she "hoped" N.A. respected the fact that R.A. needed to be clean to see the children. At that time, N.A. stated that all the children had a bond with R.A. and he believed she was on the "right track." He stated that he did not have a problem protecting the children and would limit contact with R.A. if

appropriate.

However, as noted above, Clifton received information that N.A. allowed R.A. visitation with the children in the spring of 2020 without permission or without ascertaining if she was clean, a violation of the Department's rules. All the children and their caregivers tested positive for drugs. Although N.A. tested positive for methamphetamine, Clifton stated that this was from exposure, not ingestion. At that point, T.A. and Z.B.M. were removed from N.A.'s home. Initially, when Clifton spoke to N.A. about the children being exposed, N.A. denied that the children had been around R.A. N.A. eventually admitted that he had allowed R.A. visitations with the children. He also explained to Clifton that his exposure to drugs could have been from his wife's sister who he asked not to return to the home. According to Clifton, the children were not removed from N.A. because they had been visiting R.A., but because the children tested positive for drugs.

Clifton admitted that N.A. was never an alleged perpetrator involving the children and cooperated to the point that not only his child, T.A., was placed with him, but also another sibling, Z.B.M., was placed in his home. Clifton testified that N.A. complied with his service plan. Further, she stated that before the spring of 2020, N.A. cancelled some visitations between T.A., Z.B.M., and R.A. because he believed R.A. might be using drugs. According to Clifton, if N.A. had not allowed R.A. around the children, if he and the children had not tested positive for drugs, and if he had not lied, the Department would not request that his parental rights to T.A. be terminated. She believed that N.A. was a good father and a good person; his only problem was R.A. According to Clifton, N.A. trusted R.A. and has always trusted her. Clifton stated that N.A.'s trust for R.A. was his "downfall."

According to Clifton, T.A.'s foster family is trustworthy, protective of the child, and willing to adopt T.A. if N.A.'s parental rights are terminated. Further, regardless of the outcome of the trial, the foster family wanted to continue the relationship between T.A. and N.A. Clifton stated that T.A. informed her that she wanted to continue seeing N.A., and Clifton agreed that T.A. and N.A. have a "very firm bond" and that continued contact between the father and daughter was a good thing. Although Clifton requested that N.A.'s parental rights be terminated, she still wanted N.A. to be, in "some sense," T.A.'s father. According to Traewick, T.A. wanted to keep N.A. in her life. Clifton stated that she recently learned that N.A. used corporal punishment on Z.B.M. which is also against the Department's rules. N.A. testified that he yanked

Z.B.M. up and "popped" him after the child attacked T.A. in 2019.

N.A. testified that during football season, Z.B.M. was able to see R.A. at football games and in public places. After football season, the children kept asking to see R.A. and she seemed to be doing well. According to N.A., she was acting "normal," and sober. N.A. testified that R.A. has very strong "tells" when she is using drugs such as not sleeping, biting her fingernails to the quick, and developing sores. However, N.A. admitted that R.A. may have been using drugs without him knowing it. Accordingly, in the spring of 2020, N.A. permitted R.A. to visit the children for a few hours on the weekends. He believed he was helping the children by allowing R.A. to visit. According to N.A., T.A. seemed happier and Z.B.M. relaxed after seeing his mother at football games and no longer had meltdowns.

N.A. testified that the Department made it very clear that R.A. was prohibited contact with the children, that she had to be clean before she could have contact, and that he violated the rules. He did so out of sympathy for the children's feelings. N.A. stated that he was dishonest about allowing R.A. contact with the children because if he told the truth, he would lose his children. However, he also admitted that he and R.A. have a long history, having met in high school and having been married for five years. N.A. testified that he would choose the children every single time over R.A. But N.A. also did not believe it was in the children's best interest for R.A.'s parental rights to be terminated.

Clifton believed that it was in the best interests of T.A. for N.A.'s parental rights to be terminated and for the foster family to adopt her. According to Clifton, T.A. would be safe from R.A., and from N.A. who may bring R.A. back into her life. Treawick, the volunteer advocate for CASA, testified that it is in T.A.'s best interest that N.A.'s parental rights be terminated. Her recommendation is based on the fact that N.A. broke the Department's rules by allowing R.A. to be around the children and using corporal punishment against Z.B.M. According to Traewick, N.A. allowed a drug user, R.A., in his home and did not tell the truth until much later.

The CASA supervisor testified that N.A.'s parental rights to T.A. should be terminated because he had the opportunity to provide a safe environment for the children that were in his home and he chose not to do so. Instead, N.A. chose to support R.A. and "literally" put the children in harm's way. He had a chance to "come clean" and did not do so. The attorney ad litem recommended that N.A.'s parental rights be terminated because the Department trusted him. However, N.A. violated the Department's rules by using corporal punishment on Z.B.M.

and let the children have visitation with R.A., resulting in the children testing positive for drugs.

*Conclusion.*

After viewing the evidence in the light most favorable to the trial court's best interest finding and applying the statutory and *Holley* factors, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of N.A.'s parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. In this case, N.A. failed to keep T.A. and her siblings safe from R.A. by allowing her visitations with them against the Department's rules and without knowing if she was using drugs. He knew, and acknowledged, that R.A. was not allowed to visit the children unless she was clean. As a result, N.A. and all the children tested positive for drugs. He also lied for months regarding his actions. Further, N.A. appeared to place his trust in R.A. and the children's feelings above that of his parental responsibilities to keep the children, including T.A., safe.

Although some evidence might weigh against the finding, such as N.A.'s and T.A.'s strong bond, his stability, and his regret regarding the visitations, this evidence is not so significant that a reasonable fact finder could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating N.A.'s parental rights is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule N.A.'s sole issue regarding best interest.

## DISPOSITION

Having overruled R.A.'s first, second, and unnumbered fifth issue, and N.A.'s sole issue, we ***affirm*** the judgment of the trial court as to R.A. and N.A. However, we ***reverse*** the trial court's order terminating D.H.B., Jr.'s parental rights to D.S.B. and B.M.

JAMES T. WORTHEN
Chief Justice

Opinion delivered May 28, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

21



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 28, 2021**

**NO. 12-20-00276-CV**

## IN THE INTEREST OF T.A., Z.B.M., D.S.B., E.M. & B.M., CHILDREN

---

Appeal from the County Court at Law No. 2

of Angelina County, Texas (Tr.Ct.No. CV-00041-19-01)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was error in a portion of the trial court's order, and that the same should affirmed in part and reversed in part.

It is therefore ORDERED, ADJUDGED and DECREED that the portion of the trial court's order as to R.A. and N.A. **be in all things affirmed;** and that portion of the trial court's order terminating D.H.B., Jr.'s parental rights to D.S.B. and B.M. is hereby **reversed** in accordance with the opinion of this Court; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*