**AFFIRM; and Opinion Filed June 27, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00011-CV

## IN THE INTEREST OF S.Y., A CHILD

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-1206-X-305**

## OPINION

Before Justices Francis, Lang-Miers, and Lewis
Opinion by Justice Lewis

The mother of S.Y. ("Mother") appeals the termination of her parental rights. Following a bench trial, the court found that (1) Mother had committed one statutory predicate act supporting termination, and (2) termination of Mother's parental rights was in S.Y.'s best interest. On appeal, Mother challenges the legal and factual sufficiency of the evidence supporting both of those findings. For the reasons that follow, we affirm the judgment of the trial court.

### Background

Mother, her husband ("Father"), and a teenaged cousin were detained and arrested on November 7, 2012, for shoplifting at a Walmart store. Security cameras showed them placing items in S.Y.'s stroller and then walking past the check-out area without paying. While they

were being detained at the store, S.Y. needed a diaper change. A police officer accompanied Mother to change the diaper; the officer noticed S.Y. had "a really bad diaper rash."

Police attempted to locate a relative who could take care of S.Y.—who was five months old at the time—while her parents were in police custody. When calling from Walmart was not successful, a police officer took S.Y. to the Department of Family and Protective Services (the "Department"). In a telephone conversation with a Department representative, S.Y.'s paternal grandmother offered to take S.Y., but the grandmother refused to allow someone from the Department to visit her home, a mandatory requirement for Department placement. Without a family member to act as caregiver, the Department took custody of S.Y. and placed her in foster care. Meanwhile, Mother pleaded guilty to theft and spent three days in jail.

Two days after the arrest, S.Y.'s foster mother took the baby for a physical examination. Dr. Joel Brandon Brock examined S.Y., and his report identified three conditions as "abnormal": a skin rash on her torso, a diaper rash, and cradle cap. The examination form asks whether "the patient show[s] evidence of child abuse," and Brock answered "Yes —> Neglect." Brock described the torso rash as covering the lower part of S.Y.'s face, over her neck, in the fat rolls, and in the upper torso. He stated the rashes were "things that we typically see whenever food or feces or some other fluid is left on the body for too long and not cleaned off." He testified the rash had turned into a "probable candida infection or yeast infection" in several places. Brock believed S.Y. was in a state of medical neglect because:

> [a]ny time that you have a child that is very easy to give basic care needs, just clean them off and make sure that food and feces are not left on them for an extended period of time – it takes time [for the rashes to get this bad] and it's not easy for those kinds of rashes to occur.

At a hearing on November 19, 2012, the trial court signed temporary orders appointing the Department as Temporary Managing Conservator of S.Y. Mother and Father were both ordered to participate in a parenting class, a psychological evaluation, a psychiatric evaluation,

–2–

DNA testing to determine parentage of S.Y.,[1] and a drug/alcohol assessment. They were also ordered to follow through with all recommendations made by any service providers arranged by the Department. The Department then created a Family Service Plan, which had as its goal the reunification of the family within one year.

A little over a year later, however, the Department brought suit to terminate both parents' rights to S.Y. based on three statutory grounds: family code sections 161.001(1)(D), 161.001(1)(E), and 161.001(1)(O). Witnesses at trial described the efforts made by the Department and by both parents—how the parents had succeeded and where they had failed.[2] Mother's counselors and caseworker testified that during the year between the arrest and trial, Mother completed her required parenting classes, counseling sessions, and therapy sessions. She did not undergo the required psychiatric evaluation or a drug test ordered by the Department the week before trial.

Testimony established Mother visited S.Y. regularly, and all reports of those visits indicated she and her daughter had a loving bond. Mother was not employed, but testified at trial that she had recently begun telling fortunes and she could do that to earn money if necessary. Overall, though, she depended upon Father to support the family, which included Father's mother and sister. Father did automobile body repair work; he would approach people in parking lots and offer to fix their cars for less than the owners' insurance deductible. He testified he earned enough to support his family in this way. Both parents experienced problems related to their limited formal education; over the course of the year, Mother's caseworker learned Mother could not read or write. One recurring problem for both parents was the lack of official

---

[1] There was some confusion at the time of the arrest as to Mother's relationship with S.Y. Officers testified that Father told them S.Y.'s mother was in California and that Mother was his sister. At trial, Father testified they had simply misunderstood him.

[2] Although both parents' rights were terminated in the trial court, only Mother appeals. We discuss Father's conduct and his testimony when it helps illuminate Mother's own conduct and testimony.

identification, which was necessary for most employment opportunities and for government assistance. By the time of trial, Father—but not Mother—had obtained identification. Mother and Father had moved to Texas from California in August 2012, some three months before the November arrest, and had lived in various motels since then. By the time of trial, they had leased an apartment.

However, on May 25, 2013, both Mother and Father were again arrested for theft. Mother again pleaded guilty; this time she spent a week in jail. Father's multiple prior offenses resulted in an enhanced charge. He spent three months in jail and was serving a deferred three-year sentence at the time of trial. Their sentences—especially Father's extended sentence—kept both parents from attending some sessions and visits with S.Y.

Moreover, Mother's visits with S.Y. sometimes raised concerns. S.Y.'s caseworker, who generally supervised the parents' visits, testified the parents were loving and engaged with S.Y. They brought the baby presents, including clothes and toys. However, at times it appeared they did not understand safety issues involved with her care. The parents allowed S.Y. to eat food that had been dropped on the floor and to put things in her mouth that could be harmful. They did not appear to understand fundamental notions of feeding S.Y.; the child had repeated choking incidents when her parents failed to cut her food into small enough bites and when they gave her access to an entire banana that S.Y. then shoved into her mouth. The foster parents learned S.Y. was allergic to citrus fruits. But despite being told that, Mother allowed S.Y. to sip on orange juice "because [S.Y.] reached for it." Nor did Mother seem capable of making reasonable decisions concerning S.Y.'s future: when asked about her plans for S.Y.'s education, Mother replied that she thought she would home school her daughter.

S.Y.'s caseworker testified that the Family Service Plan required S.Y.'s parents to make "actual life changes." She testified the baby's condition when she came to the Department was

not so bad that the parents could not have regained custody if they had made those life changes. But she testified their ability to parent S.Y. was the same before and after parenting classes. She opined it was in S.Y.'s best interest to terminate the parents' rights.

The supervisor of S.Y.'s Court Appointed Special Advocate ("CASA") made similar observations. She testified she did not see any change in the parents' behavior after the parenting classes. She stated:

> They certainly were very loving with her. That can't be denied. They just didn't seem to understand the kind of things that she needs emotionally and physically and really encouraging her development in a very positive way.

The CASA advocate herself related that Mother had said she was "not interested" when presented with a list of agencies that could provide services to the family, including medical care for S.Y. and literacy programs for Mother. The advocate testified she was upset by Mother's reaction:

> [b]ecause CASA had tried several times to support them and to help them address some significant concerns, so reunification would be possible. And every time they showed either a lack of capacity to understand that, or just a disinterest in even addressing the problem.

Finally, Mother's counselor testified she had concerns about Mother's ability to provide for S.Y. She explained that Mother was relying on her husband to provide financially and was unable to get a job herself. This lack of independence was considered dangerous by the professionals involved in the case because of the risk presented by Father's pattern of criminal history and incarceration. The counselor was concerned that Mother was not able to verbalize any specific plan or goals for taking care of S.Y. and living independently. She did not believe that Mother had made progress toward the goals of her therapy, and she did not believe Mother was capable of providing for a child on her own.

The trial judge initially took the case under advisement, expressing a desire to go back through the evidence. The next day, having done so, the judge found that the parents had

committed the conduct defined by family code section 161.001(1)(O), but declined to make findings under sections 161.001(1)(D) or (E). He spoke on the record to the concern that termination not be based on poverty, misfortune, or lack of training. But he stated that after considering all the evidence, he was "convinced that apart from having someone to be with these parents, pretty much all the time, that they are not going to be able to care for this baby." Addressing the best-interest issue, the judge cited what he acknowledged were "simplistic" examples of problems: the baby choking on large pieces of food, Mother giving her citrus despite her allergy, Mother believing she could home school S.Y. He concluded that it would be "a real problem" for the parents to take care of S.Y. themselves, and he ultimately concluded it would be in the child's best interest for both parents' rights to be terminated.

Mother appeals the trial court's judgment.

## Standard of Review

A court may order involuntary termination only if the court finds that (1) a parent has committed one or more of the statutory enumerated predicate acts or omissions, and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West 2014). Given the constitutional magnitude of the interests at stake, the trial court's findings must be made by clear and convincing evidence to reduce the risk of erroneous terminations. *Id*.; *In re B.L.D.*, 113 S.W.3d 340, 351–52 (Tex. 2003).

The supreme court has identified the appropriate standards for appellate courts reviewing the legal and factual sufficiency of findings made under this heightened burden of proof. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002) (defining the standard of review for legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (defining the standard of review for factual sufficiency). In both instances, we ask whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State

bears the burden of proof. *In re J.F.C.*, 96 S.W.3d at 265–66; *In re C.H.*, 89 S.W.3d at 25. However, in *In re J.F.C.*, the supreme court explained that we must approach the body of evidence differently in legal and factual sufficiency reviews. When reviewing legal sufficiency, we traditionally look at the evidence in the light most favorable to the finding. In the clear-and-convincing context, this means we must assume that the factfinder resolved disputed facts in favor of its finding, if a reasonable factfinder could do so. *In re J.F.C.*, 96 S.W.3d at 266. We must disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* We do not, however, disregard undisputed facts that do not support the finding. *Id.* When reviewing factual sufficiency, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *Id.* This means we must look at the disputed evidence and adjudge whether a reasonable factfinder could have resolved that evidence in favor of the finding. The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

## Termination of Parental Rights

In seven issues, Mother contends the evidence is both legally and factually insufficient to support the termination of her parental rights. Mother challenges the evidentiary support for both the statutory predicate act and the trial court's best-interest conclusion.

### *Section 106.001(1)(O)*

In her fourth issue, Mother argues there was not clear and convincing evidence that she committed one or more statutory predicate acts identified as grounds for termination. The trial

–7–

court found by clear and convincing evidence that both parents had committed the conduct defined by section 161.001(1)(O).[3] Thus, the trial court found that Mother:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(1)(O).

Mother challenges the finding that she failed to comply with certain Court-ordered services that were incorporated into the trial court's order. She argues the services "were basically completed," and she contends the parents "should be commended for progressing from practical homelessness to a home in [their] names." However, undisputed evidence established that neither parent had undergone the required psychiatric evaluation or submitted to a drug test required by the Department. Mother had explanations for both failures. She and her husband testified they were unable to undergo the psychiatric evaluation because of requirements at the Metrocare facility: first for identification and then for income verification. And as to the drug test, Mother testified that she did not want to take it, but also that her attorney told her not to take it. Regardless of these explanations, section 161.001(1)(O) does not "make a provision for excuses" for a parent's failure to comply with the trial court's order. *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.). Nor does it "provide a means of evaluating partial or substantial compliance with a plan." *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.).

---

[3] The court specifically declined to make findings under the other two grounds urged by the Department, i.e. sections 161.001(1)(D) and 161.001(1)(E), which involve placing a child in conditions or surroundings that endanger the child's well-being or engaging in conduct that endangers the child's well-being. Mother's brief challenges the sufficiency of the evidence to support violations of sections D and E. Because the trial court rejected these grounds for termination, we do not address them.

Mother conceded she had not undergone the psychiatric evaluation or taken the drug test; indeed, there is really no dispute on this issue. We conclude that clear and convincing evidence established that Mother failed to complete those court-ordered services. Thus, the violation of section 161.001(1)(O) is supported by legally and factually sufficient evidence, and we overrule appellant's fourth issue.[4]

### *Best Interest of the Child*

In her third and seventh issues, Mother challenges the sufficiency of the evidence supporting the trial court's conclusion that termination of Mother's parental rights was in the best interest of S.Y. As we examine the evidence concerning S.Y.'s best interest, we remain mindful of the strong presumption that a child's best interest is served by keeping custody in the natural parent. *In re J.W.*, 152 S.W.3d 200, 207 (Tex. App.—Dallas 2004, pet. denied).[5]

When deciding whether termination is in the best interest of a child, we consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

---

[4] Mother does not challenge any other elements of a section O violation. Nevertheless, we note that the evidence was undisputed that S.Y. had been in the Department's custody for more than nine months. And as to the cause of S.Y.'s removal from her parents, the Department's Family Service Plan cites its original referral alleging "neglectful supervision," given that both parents were arrested and could not care for S.Y. In addition, two days after the parents' arrest, S.Y.'s medical condition was classified as "neglect" by her examining doctor.

[5] This presumption is stressed by appellant in the first "issue" in her brief. We agree with the legal premise appellant raises there: the constitutional dimension of the parental relationship requires strict scrutiny of termination proceedings. *See In re J.F.C.*, 96 S.W.3d 256, 302 (Tex. 2002). However, appellant's first issue does not contain a legal or factual question for us to answer—it contains only a statement of the law. Thus, we need not make a ruling on the issue.

S.Y. was five months old when she entered the Department's care; she was approximately eighteen months old at the time of the court's decree of termination. Although she was not old enough to express preferences, the record supports the conclusion that S.Y. experienced a positive bond with her natural parents and with her foster parents. Given the presumption in favor of the natural parents, the first *Holley* factor weighs against termination.

The second and third factors address emotional needs and dangers for the child and physical needs and dangers for the child. The record substantiates a loving relationship between Mother and her daughter. There is reason to believe mother would provide the emotional support S.Y. needed and would not endanger her emotionally. However, along with the significant demands that any young child makes on a parent in terms of physical needs, S.Y. also has issues involving unusually sensitive skin and at least one food allergy. The record provides reasons for concern as to whether Mother understands these physical needs of her daughter and whether she is capable of meeting them. S.Y. will be completely dependent on adult care for her health, hygiene, and safety for many years. Although the skin-care issues from which she suffered at the time of the first arrest were not life-threatening, the medical testimony at trial explained the neck rash could have caused serious injury to S.Y. had it gone untreated.[6] Mother did not believe then that S.Y. needed to see a doctor. And professionals who observed Mother interact with S.Y. over the course of a year expressed concern that Mother would still not recognize when the child needed medical attention. Therefore, while *Holley* factors related to

---

[6] Brock testified S.Y. healed well under foster care, but when asked about whether she needed follow up care, he testified she did:

because the lesion was bad enough where I thought it was actually going to penetrate completely through the fat roll. And I was worried about there becoming exposure into the upper thorax or in the actual neck. And so when you get the topical fungal infection, it's possible at time to get staph or strep in there. So I gave a topical, I think I gave a statin cream which was for yeast. But I was wanting to monitor that. It was so bad, it was so excoriated that it's possible for – in the natural crease line for the infection to get so deep that that will completely tear in half as if somebody has almost been hatched across the neck. So I was very, very concerned about the thinness of the tissue. So I asked for multiple follow ups. And I believe – I know I gave at least one medication, maybe even two, to make sure that infection did not completely destroy that tissue.

emotional care weigh against termination, factors related to physical needs and care weigh in favor of termination.

The next two factors speak to Mother's parental abilities. Here again, the observations and evaluations of the professionals who worked with Mother argue for termination. Mother did not seem to be able to apply what she was taught in parenting classes, or what she learned in counseling, to her dealings with S.Y. She was repeatedly offered sources for programs that would help her to promote S.Y.'s best interest directly (including government assistance, medical services, food pantries) and indirectly by helping Mother to improve her own skills (including literacy programs, job training). And at trial Mother testified she would take advantage of those programs. But the record indicates she never took advantage of them during the year S.Y. was in the Department's care, and she actually told those trying to help her she was "not interested" in a list of those providers. If Mother were self-sufficient, we would not be concerned at her rejection of assistance, but she is not. These factors argue in favor of termination.

The sixth and seventh factors address Mother's plans for S.Y. and the relative stability of Mother's home and the proposed placement. One criticism of Mother's lack of growth was her inability to articulate a plan for S.Y. The record does not indicate Mother was able to make reasonable decisions concerning the future for her daughter. For example, given that Mother could not read and write, and had not taken advantage of free literacy programs when encouraged by the caseworker to do so, we consider her stated plan to home school her child an example of poor judgment and unreasonable decision-making. Much of the evidence in favor of termination relates to the lack of stability in Mother's life. By contrast, S.Y.'s year with the foster family has been stable: she lives with her foster parents and two other foster siblings; her health care needs have been attended to; her foster parents have the economic means to provide

for her; and she is clearly loved in that home. The Department recommends placing S.Y. permanently with her foster family. The foster mother testified at trial to the bond between S.Y. and her foster parents and to their desire to adopt S.Y. We conclude these factors also weigh in favor of termination.

The eighth factor addresses the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one. We have addressed Mother's failure to grow in her understanding of S.Y.'s needs. The Family Service Plan stressed that the parents would need to make a number of changes to regain custody. One specifically enumerated change was: "Parent will stop participating in criminal acts and accept responsibility for prior criminal activity." Mother's second arrest indicates she was not able to effectuate this critical change. By choosing to steal again, she failed to make reunification with S.Y. her priority. This factor weighs most heavily in favor of termination.

Finally, *Holley* directs us to consider "any excuse for the acts or omissions of the parent" as part of our best-interest analysis. *Id.* Appellant's sixth issue argues that:

> Termination of the parent-child relationship is not justified when the evidence shows that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice.

The issue is taken from the opinion in *Clark v. Dearen*, 715 S.W.2d 364 (Tex. App.—Houston [1st Dist.] 1986, no writ). In *Clark*, the court of appeals reversed the termination of a father's parental rights when it concluded the evidence of his endangering his son did not rise to the level of clear and convincing. The father was illiterate and totally disabled from a back injury and serious burns. *Id.* at 367. He depended on social security and food stamps; he was unable to procure a driver's license because of his inability to read. *Id.* There was evidence the child was dirty, but no expert evidence indicating he had suffered physical or emotional harm. *Id.* The court of appeals stated:

–12–

Although these facts indicate that appellant might lack some of the attributes of the ideal parent, this Court finds that the harsh and irrevocable remedy of termination of the parent-child relationship is not justified where the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice.

*Id.*[7]

Certainly there are factual similarities between the father in *Clark* and Mother in our case: both labor under disadvantages from lack of education and both experience a level of economic hardship. However, the differences between the two parents outweigh their similarities. Despite his illiteracy, the father in *Clark* succeeded in doing what he needed to obtain appropriate government assistance for himself and his child. Nothing in *Clark* indicates the father ever considered criminal conduct as a solution to economic difficulty. Mother, however, did not take advantage of services offered to help her get the identification necessary to seek employment or appropriate government assistance for herself or S.Y. Instead—despite knowing that S.Y. had been placed in foster care following the November arrest for theft— Mother was again arrested and jailed for theft the following May.

We recognize that termination should never be used as a way to reallocate a child to "better" or more prosperous parents. *In re J.W.*, 152 S.W.3d at 207. "[P]arental rights may not be terminated merely because a child might be better off living elsewhere." *In re C.R.*, 263 S.W.3d at 375. The trial court specifically evaluated the evidence to be sure Mother's termination was not based solely on factors such as misfortune or lack of training. In this case, however, the record establishes that Mother has continued to make choices that do not put her child's safety and welfare first. We conclude the trial court did not terminate Mother's rights

---

[7] We note that misfortune or a lack of education or training are not affirmative defenses that would negate all the evidence showing termination is in S.Y.'s best interest. Instead, they are just one factor to be considered in making and reviewing the best-interest determination. *See In re S.H.A.*, 728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

–13–

solely because of Mother's "misfortune or the lack of intelligence or training."  We overrule her sixth issue.

When we consider all the *Holley* factors, and the record as a whole, we conclude clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights was in S.Y.'s best interest.  Accordingly, we overrule Mother's third and seventh issues.

In her second issue, Mother challenges the factual sufficiency of the overall conclusion to terminate.  And in her fifth issue, she argues the Department's level of proof in favor of termination did not rise to the level of clear and convincing.  We have concluded that both prongs of the termination statute are supported by clear and convincing evidence.  Accordingly, we overrule Mother's second and fifth issues as well.

### Conclusion

We have resolved all of Mother's issues against her.  We affirm the trial court's judgment.

/David Lewis/
DAVID LEWIS
JUSTICE

140011F.P05

–14–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF: S.Y., A CHILD,

No. 05-14-00011-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas

Trial Court Cause No. 12-1206-X-305. Opinion delivered by Justice Lewis, Justices Francis and Lang-Miers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 27th day of June, 2014.