**AFFIRMED and Opinion Filed March 3, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00789-CV**

**IN THE INTEREST OF A.O. AND C.O., CHILDREN**

**On Appeal from the County Court**
**Kaufman County, Texas**
**Trial Court Cause No. 101811CC**

## MEMORANDUM OPINION

Before Justices Molberg, Nowell, and Goldstein
Opinion by Justice Goldstein

This is an appeal from a final order terminating Mother's parental rights. In three issues, Mother contends that the evidence was legally and factually insufficient to support the trial court's findings that: (1) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, (2) Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, and (3) termination of Mother's parental rights was in the children's best interests. We affirm the order of termination.

# BACKGROUND[1]

On January 30, 2019, Mother was driving Father to a bus stop to drop him off. Their children, A.O. and C.O., respectively eight and two years old at the time, were in the back seat. Mother and Father had an argument, amid which Father grabbed the steering wheel and jerked it. Mother pulled the car into the parking lot of a convenience store and told A.O. to run inside and call the police. When the police arrived, they questioned Mother about the incident, and she reported that Father tried to crash the car into a pole. Father was arrested and charged with aggravated assault with a deadly weapon.[2]

Acting on a report from the police, the Texas Department of Family and Protective Services (the department) conducted an investigation into the incident. During the course of that investigation, Mother submitted to drug testing, which returned positive for methamphetamines. On February 27, 2019, the department initiated this termination suit and sought an emergency temporary order of removal. The trial court granted the motion and scheduled an adversary hearing to take place

---

[1] As a threshold matter, Mother's brief includes general objections to the clerk's record, requesting that we remove or not consider identified portions and asserting that they were not admitted into evidence. We decline the invitation to do so. A review of the record reflects the trial court took judicial notice of the documents in its file, and therefore the objected-to documents were admitted for purposes of our consideration. *See* TEX. R. EVID. 201; *Sierad v. Barnett*, 164 S.W.3d 471, 481 (Tex. App.—Dallas 2005, no pet.) (trial court may take judicial notice of its own records); *see also In re C.A.K.*, 155 S.W.3d 554, 559 (Tex. App.—San Antonio 2004, pet. denied) (appellate court may disregard, and is not required to strike, irrelevant portions of the record).

[2] Although Mother testified that Father was arrested for child endangerment, the record contains copies of Father's indictment and judgment of conviction. The indictment reflects Father was charged with aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. § 22.02(a)(2). The judgment reflects that Father pled guilty and was convicted of the lesser included offense of assault. *See* TEX. PENAL CODE ANN. § 22.01(a)(1).

on March 7, 2019. Following that hearing, the trial entered a temporary order removing the children from Mother's care, naming the department the children's temporary managing conservator, and appointing a guardian ad litem to represent the children. The children were placed in a shelter and eventually transferred to foster care.

Pursuant to section 263.101 of the Family Code, the department worked with Mother to prepare a service plan aimed at reuniting Mother with the children. The service plan required Mother to undergo psychological evaluation, attend counseling, submit to regular drug testing, and join Alcoholics Anonymous or Narcotics Anonymous. The service plan also required Mother to maintain stable employment, obtain stable and drug-free housing, avoid drug use and criminal activity, and, seek inpatient treatment if any of her drug tests were positive. The trial court adopted the service plan by written order on March 7, 2019.

Over the next two years, the department oversaw Mother's compliance with the service plan. Mother completed drug counseling in June 2019, and her drug test results were negative throughout the remainder of 2019. On February 4, 2020, however, Mother tested positive for methamphetamines. After three negative results between March and May 2020, Mother tested positive again on May 19 and June 2, 2020. On June 12, 2020, the department filed a permanency report alleging that Mother had failed to maintain sobriety and failed to initiate inpatient treatment as a result. Following a hearing on June 18, 2020, the trial court entered an order finding

that Mother had failed to comply with the service plan. The order re-adopted the service plan and directed Mother to comply. Mother tested positive for methamphetamines again in October 2020. On January 20, 2021, the trial court held a permanency hearing before final order pursuant to section 263.306 of the Family Code. The trial court again found that Mother had failed to comply with the service plan and set the termination proceeding for trial.

Trial took place on June 7–9 and June 22, 2021. The trial court found in favor of the department and entered a final order terminating both parents' rights[3] and appointing the department as the children's permanent managing conservator. Mother timely appealed.

## DISCUSSION

### I. STANDARD OF REVIEW

Because the fundamental liberty interest of a parent in the care, custody, and control of his or her child is one of constitutional dimensions, involuntary parental termination must be strictly scrutinized. *See Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). A trial court may order involuntary termination of parental rights only if the court finds that (1) the parent has committed one or more of the statutory enumerated predicate acts or omissions,

---

[3] The department and Father entered into a Rule 11 Agreement stipulating Father's parental rights would be terminated under section 161.001(b)(1)(O) of the Family Code, which provides for termination following a parent's failure to comply with a service plan after a child's removal for abuse or neglect. Father does not appeal the termination of his parental rights.

and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *see also In re S.Y.*, 435 S.W.3d 923, 927 (Tex. App.—Dallas 2014, no pet.). "Given the constitutional magnitude of the interests at stake, the trial court's findings must be made by clear and convincing evidence to reduce the risk of erroneous terminations." *Id.* (citing *In re B.L.D.*, 113 S.W.3d 340, 351–52 (Tex. 2003)).

The supreme court has identified the appropriate standards for appellate courts reviewing the legal and factual sufficiency of findings made under this heightened burden of proof. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002) (defining the standard of review for legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (defining the standard of review for factual sufficiency). In both instances, we ask whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the department bears the burden of proof. *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25. However, in *J.F.C.*, the Court explained that we must approach the evidence differently in legal and factual sufficiency reviews. When reviewing legal sufficiency, we look at the evidence in the light most favorable to the finding. In the clear-and-convincing context, this means we must assume that the factfinder resolved disputed facts in favor of its finding, if a reasonable factfinder could do so. *J.F.C.*, 96 S.W.3d at 266. We must disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* We do not, however, disregard undisputed facts that do not support

the finding. *Id.* When reviewing factual sufficiency, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *Id.* This means we must look at the disputed evidence and adjudge whether a reasonable factfinder could have resolved that evidence in favor of the finding. The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

## II. ANALYSIS

The trial court found that clear and convincing evidence supported termination of Mother's parental rights under subsections 161.001(b)(1)(D) and (E) of the Family Code[4] and that termination would be in the children's best interest. Mother challenges the legal and factual sufficiency of the evidence in support of both statutory grounds and the best-interest finding.

---

[4] Ordinarily, we need only uphold one termination ground in order to affirm, even if the trial court based the termination on more than one ground. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). However, if a trial court predicates termination on sections 161.001(b)(1)(D) and (E), we must review the legal and factual sufficiency of the evidence supporting those grounds if challenged. *See id.* That is because under subsection (M), parental rights may be terminated if clear and convincing evidence supports a finding that a parent has had his or her rights over another child terminated under subsections (D) or (E). *See id.* (citing TEX. FAM. CODE ANN. § 161.001(b)(1)(M)). Due to the collateral effect that a finding under subsections (D) and (E) might have on a future termination proceeding pursuant to subsection (M), due process requires that we review both findings. *See id.*

## A.     Termination under Sections 161.001(b)(1)(D) and (E)

Section 161.001(b)(1)(D) authorizes termination if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) authorizes termination if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Both subsections focus on endangerment to the child's physical or emotional well-being. In this context, "endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *see also In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas, 2019, pet. denied). Although endangerment requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *M.C.*, 917 S.W.2d at 269. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

–7–

The primary distinction between the two subsections is the source of the physical or emotional endangerment to the child. *C.V.L.*, 591 S.W.3d at 750. Subsection (D) addresses the child's surroundings and environment while subsection (E) addresses parental misconduct. *Id.* Parental conduct, however, is also relevant to the child's environment under subsection (D). *In re J.D.B.*, 435 S.W.3d 452, 463–64 (Tex. App.—Dallas 2014, no pet.). That is, "[c]onduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Id.* "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.")); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of the living conditions but also to a parent's conduct in the home).

Subsection (E) refers to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act. *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied). Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *C.V.L.*, 591 S.W.3d at 750. In determining whether a parent engaged in a course of endangering

conduct, a trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the department. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

### 1.    Evidence

The trial court heard testimony from eight witnesses, including Mother, Karen Monsivais (child therapist), Maria Parides (Mother's therapist), Brenda Shipley (social worker), Ashlin Samuel (department case worker), Sharese Thomas (department case worker[5]), Lori Crow (Mother's chemical dependency counsellor), and Shelley Hays (guardian ad litem).[6] The evidence received by the trial court included Mother's history of drug use, the exposure of the children to family violence, Mother's involvement of the children in criminal activity, and Mother's failure to comply with the court-ordered service plan.

### a.    Drug Use

The evidence of Mother's drug use is substantial and covers a twenty-year span. Mother testified that she began using crack cocaine in 2000, including during her 2001 pregnancy with B.H., one of her older children from a prior relationship. In 2005, another of her older children, C.H., tested positive for cocaine at birth and was given up for adoption. Mother's former husband, K.H., obtained custody of the

---

[5] Samuel was the department case worker from February 2019 to January 2021, when she obtained new employment. Thomas was assigned the case upon Samuel's departure.

[6] The record reveals that the trial court granted a motion to confer with A.O. in chambers. The order states that the conference would be on the record, but the record on appeal does not include a transcript of the conference.

remaining three children around 2005. Mother testified that while the children were in K.H.'s care, he sexually abused their oldest daughter.[7] According to Mother, the department became involved in that case and, because Mother tested positive for drugs, she was ordered to complete a service plan to regain custody. Mother testified that she completed those services in 2006, whereupon the children were returned to her.

Although Mother testified that she was "clean" from 2006 to 2019, there was evidence to belie that claim. Crow testified that Mother mentioned in counseling that she had used drugs in front of all her children at some point. Crow also testified that Mother acknowledged having driven under the influence with her children in the car. Samuel testified that A.O. reported witnessing Mother and her oldest son smoking marijuana in the house. A.O. also told Samuel that Mother would bring A.O. with her when she went to get drugs, leaving A.O. in the car by herself while Mother went into the drug house. A.O. further reported that Mother would sometimes pass out for days at a time, leaving A.O. to take care of herself and C.O.

There was also evidence of Father's history with drugs. Mother testified that she learned Father was addicted to heroin before A.O. was born. Mother testified that Father's drug use was recurring: he would tell her he was clean and was receiving counselling, but would inevitably relapse. For example, after A.O.'s birth,

---

[7] Parides testified that Mother revealed in therapy that the abuse occurred while Mother was "under the influence." It is not clear from the record whether Mother's and Parides's accounts refer to the same incident.

–10–

Father told Mother that he was clean, going to church, and staying at a halfway house. Mother and Father resumed their relationship, but Father relapsed three or four months later.[8]

### b.     *Family Violence, Abuse, Aggression, and Toxic Relationship*

The trial court heard evidence regarding the volatile and sometimes violent relationship between Mother and Father. Shipley testified that during interviews, A.O. would talk about Mother and Father fighting in the home. Hays testified that A.O. revealed in therapy that she was afraid if she was returned to Mother's care, Mother would let Father "come back" and he "might hit her." Mother testified that her on-and-off relationship with Father was "toxic" and that Father's drug use made him unpredictable. In a 2015 incident, Father got into a physical altercation with a seventeen-year-old family friend outside Mother's home. Mother testified that the fight occurred because Father came to the house to take A.O. to a restaurant, but Mother refused him access upon learning he was "high." The police were called, and according to Mother, Father told the police that he was "up for three or four days sleeping in his car" and was "really strung up." The department became involved and Father was ordered to undergo treatment. Father completed his treatment, but soon after resuming his relationship with Mother, Father relapsed again. Mother

---

[8] Although the record is not clear regarding the timeline of Mother and Father's on-and-off relationship, we glean from the record that they were separated at the time of the 2015 altercation described below but back together again in 2016 when C.O. was conceived.

testified that she understood Father's drug use harmed the children because drugs "mess with your mind, so you're not thinking clear" and "you're not able to watch your kids." Mother also testified that Father introduced her to methamphetamines and was a "drug-use trigger" for her. Despite this knowledge, however, Mother maintained an on-and-off relationship with Father and allowed Father to visit the children and take them to restaurants. In another incident, Mother snuck Father into the home against the wishes of the children's grandmother, with whom Mother and the children were living at the time. Mother testified that grandmother forbade Father from entering the home because of his history of drug use. That night, Mother's eldest son encountered Father in the home and, thinking Father to be an intruder, stabbed him. The police were called and Mother's son was arrested.

The trial court also heard details of the incident that gave rise to this termination proceeding. On January 31, 2019, Mother was driving Father to the bus stop after visiting the children. Mother and Father were arguing, and Father grabbed the steering wheel and jerked it. Mother pulled the car into a convenience store and directed A.O. to go in and call the police. Mother reported to the police that Father was trying to crash the car into a telephone pole. At trial, however, Mother testified that Father did not actually turn the car into a pole; rather, the police fabricated that story and instructed her to lie in her report. Despite Mother recanting her story, A.O.'s recollection of the incident was similar to Mother's initial report. Shipley testified that, during interviews, A.O. reported that Father turned the wheel of the

car and pointed it toward a light pole. According to Shipley, A.O. "repeated that several times both in play and in conversations."

### c. Criminal Activity

The trial court heard evidence that Mother encouraged A.O. to shoplift. Shipley testified that during her interviews, A.O. reported being asked by Mother to shoplift at Walmart.[9]

### d. Family Service Plan

The trial court also heard evidence that Mother failed to comply with the court-ordered family service plan. As a part of the plan, Mother was required to "refrain from using illegal substances" and submit to regular drug tests. Samuel, who was assigned to Mother's case until January 31, 2021, testified about the department's procedure for scheduling random drug tests. Approximately twice a month, Samuel would schedule drug tests and notify Mother early in the morning via text message. Mother would then have until 4:30 p.m. to appear at the lab and

---

[9] Samuel provided corroborating testimony that Mother and Father involved the children in shoplifting at Walmart. According to Samuel, A.O. reported to her foster mother that her parents would take her to Walmart and encourage her to shoplift. A.O. reported that she would go to Walmart with one parent while the other parent stayed home "so if they get caught there is someone else to come get the [children]." A.O. explained that Mother and Father would look for receipts in the parking lot for use in their scam. A.O. also reported having seen the inside of a surveillance room on multiple occasions. At trial, Mother objected to this testimony on hearsay grounds. The department responded that the statements were not offered for the truth of the matter asserted, but rather to inform the court regarding the department's decision to terminate parental rights. *See* TEX. R. EVID. 801(d). The trial court sustained the objection but allowed the testimony for the limited purpose of assessing the department's decision-making. On appeal, neither party addresses the trial court's ruling on the objection. Accordingly, we do not consider Samuel's testimony regarding A.O.'s accounts of shoplifting, as told to Samuel by A.O.'s foster mother. *See Olympia Capital Assocs., L.P. v. Jackson*, 247 S.W.3d 399, 411 (Tex. App.—Dallas 2008, no pet.) (declining to consider affidavit testimony where trial court sustained objections to affidavit and appellee did not challenge the ruling on appeal).

–13–

provide either a hair or urine sample. Samuel explained that a urinalysis would indicate drug usage in the previous seventy-two hours, while a hair follicle test would reveal usage for the previous three months. Samuel testified that she cautioned Mother at the outset of the proceedings that the department would consider any missed test a positive result. Mother denied receiving that warning. Samuel also testified that some tests were observed; i.e., someone from the testing facility would watch as Mother provided the sample. Samuel testified that Mother was not always notified in advance whether a given test would be observed.

From March 2019 to May 2021, Mother was scheduled for approximately forty tests. Throughout 2019, the results were primarily negative.[10] Starting in February 2020, however, Mother began relapsing. On February 4, 2020, Mother's urinalysis returned a positive result for methamphetamines. Mother testified that she used methamphetamines as a "celebration" for being "clean for a year." Mother's next two tests were scheduled for February 21 and March 3, 2020, both of which she missed. Mother's urinalysis results for March 17, March 25, and May 19, 2020, were negative, but her hair follicle test on May 19, 2020 was positive for methamphetamines. Mother's June 19, 2020, urinalysis was also positive for methamphetamines. Mother missed her scheduled tests in July and August 2020. On

_____

[10] The only 2019 result the department considered positive was the urinalysis from July 30. For that test, Mother's urine was too dilute to be accurately tested. Samuel testified that Mother's explanation was that she had been drinking apple cider vinegar for weight loss. Samuel testified that she had cautioned Mother not to drink excessive fluids before a test because the department would consider a dilute result as a positive. Mother denied receiving that warning as well.

–14–

September 3, 2020, Mother refused to provide a urine sample after being told that she would be observed. Mother relayed to Samuel that she declined because she had not shaved and was embarrassed. For her second September 2020 test, Mother submitted a urine sample that was invalid for being too cold. Samuel testified that a cold sample cannot be tested due to the implication that the person brought the urine in from outside. Mother missed two more tests in October 2020. On October 27, 2020, Mother again tested positive for methamphetamines. From November 2020 through March 2021, Mother's urinalysis results were negative, as was her March 2021 hair follicle test. However, on April 13, 2021, Mother again refused to provide a urine sample after being told it would be observed. Mother testified that she had a urinary tract infection and did not want to be observed. Samuel testified that Mother told her she had "some issues down there" and needed to go to the doctor. Samuel told Mother that if she had a legitimate medical reason for refusing the test, she would need to provide a doctor's note. Mother did not provide one. Mother was scheduled for tests in April and May 2021 but did not appear. Mother claimed the reason for missing the May 2021 test was because her "phone was turned off or [she] didn't have a connection."

Pursuant to the family service plan, Mother was required to "immediately seek inpatient treatment" in the event any of her drug tests returned a positive result. Mother failed to do so. Mother completed her group counseling requirement in May 2019. Mother then began individual therapy. Parides testified that the goal of the

therapy was to address "healthy patterns of relationships within the family, to be a protective parent, to discuss [Mother's] addiction history and relationship with partners and her children." Mother attended one session with Parides in June 2019 but did not attend any sessions in July. Mother resumed therapy in August, attending nine more sessions through the end of 2019. Mother then stopped attending in February 2020 and did not resume her sessions until October. Parides testified that by December 2020, Mother needed six to eight more sessions to complete her therapy. However, after Mother failed to appear for her scheduled sessions in March and April 2021, Parides discharged Mother. Parides testified that she ended the therapy because "[f]or one, the case had been open too long and two, it seemed to me that it was more a substance abuse issue at this point." When asked to explain the second reason, Parides stated that Mother had acknowledged relapsing but did so to "demonstrate more sobriety time."

Mother also received outpatient drug counseling. Crow testified that Mother began drug counseling in April 2020 but was discharged in June for failing to attend. She resumed in November 2020, and Crow testified that Mother made progress. Specifically, Crow stated that Mother made progress by coming to terms with her past and acknowledging she was responsible for her own actions. Mother also acknowledged that her relationship with Father was "toxic" and that he was a drug-abuse trigger for her. Mother completed her therapy with Crow in April 2021, and Crow stated her belief that, given Mother's progress, she should be reunited with her

children. On cross-examination, however, Crow admitted not knowing about Mother's refusal to submit to drug tests in April and her failure to appear for testing in May. Crow testified that she had impressed on Mother the importance of submitting to drug tests. Crow explained that failure or refusal to submit to drug tests could indicate that a person is using again. Crow stated that if she learned Mother is using drugs again, she would not recommend that her children be returned to her.

### 2.    *Analysis*

The evidence supporting the trial court's findings under Family Code sections 161.001(b)(1)(D) and (E) focused on Mother's acts and omissions, rather than the children's living conditions. Although subsection (D) requires us to review the children's "conditions or surroundings," a parent's conduct is relevant to that inquiry. *J.D.B.*, 435 S.W.3d at 464. We therefore conduct a consolidated review. *See In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied) ("Because the evidence pertaining to subsections 161.001(1)(D) and (E) are interrelated, we conduct a consolidated review.").

We begin with Mother's conduct before A.O. and C.O. were born, as such evidence "can be a relevant factor in establishing an endangering course of conduct." *See J.O.A.*, 283 S.W.3d at 345. Mother had a long history of drug abuse dating back to 2000. Mother used cocaine while pregnant with at least two prior children. Mother admitted to her therapists that she had used drugs in front of all of her children, that she had driven under the influence with her children in the car, and that she had

–17–

neglected their care while she was using. Mother argues that this history is not relevant here because she was clean for roughly thirteen years and successfully completed drug counseling in the course of these proceedings. We disagree. Evidence of Mother's history with drug abuse and the effect drugs had on her parenting of her older children is probative because it reflects Mother's parenting of A.O. and C.O. when she relapses. That connection is not merely hypothetical, given A.O.'s statements to the department that Mother would be passed out for days at a time, leaving A.O. to take care of herself and C.O. *See In re D.C.*, 128 S.W.3d 707, 711 (Tex. App.—Fort Worth 2004, no pet.) (evidence of drug use and resultant neglect of children supported termination under subsections (D) and (E)).

Mother's history of drug use and continued drug use after the children's removal supports the trial court's termination order. *In re C.R.*, 263 S.W.3d 368, 372 (Tex. App.—Dallas 2008, no pet.) ("The use of illegal drugs by the parent may be considered endangering conduct that supports terminating parental rights."). Mother's failed test for methamphetamines in February 2019 prompted the initiation of this termination proceeding. In the family service plan, Mother agreed to maintain a drug-free lifestyle as a condition of reunification with the children. Mother largely maintained sobriety throughout 2019 but began relapsing starting in February 2020. Mother tested positive for methamphetamines in February 2020, May 2020, June 2020, and October 2020. On two occasions (in September 2020 and April 2021), Mother refused to submit urine samples after being told she would be observed. On

another occasion (September 2020), Mother's urine sample was considered invalid under protocols for being outside the range of normal temperature. On numerous other occasions—February 2020, March 2020, July 2020, August 2020, and October 2020—Mother did not appear at the testing facility to submit to testing. The trial court could infer from these incidents that Mother's test results would have been positive if she had submitted to testing.[11] *See id.* at 370.

There was also evidence indicating that continued therapy would not be effective in preventing Mother's drug relapses in the future. Mother completed group drug counseling sessions in June 2019. However, Mother was discharged from individual therapy with Parides in April 2021 for failing to appear to her scheduled appointments. Additionally, although mother completed her outpatient drug counseling with Crow in April 2021, she missed her scheduled drug tests in April and May 2021. As Parides testified, Mother's behavior seemed to be aimed at "demonstrating more sobriety time." *See In re J.J.L.*, 578 S.W.3d 601, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("[S]ubstance abuse is hard to escape,

---

[11] Mother requests that we take judicial notice that drug use increased during the COVID-19 pandemic. At trial, there was no evidence connecting Mother's drug use to the pandemic, nor was this argument brought to the attention of the trial court. Mother testified that she used methamphetamines in February 2020 as a "celebration" for remaining sober for a year. Mother testified that she used methamphetamines in October 2020 because she was depressed when A.O. told her she wanted to be adopted. To the extent there was a general increase in drug use during the pandemic, a claim for which there was no evidence presented at trial, the trend is not relevant in this case and has otherwise been waived. Accordingly, we deny Mother's request. *See City of Dallas v. VRC LLC*, 260 S.W.3d 60, 63 (Tex. App.—Dallas 2008, no pet.) (denying request for judicial notice of pleadings irrelevant to the disposition of the appeal).

and the fact finder is not required to ignore a long history of dependency merely because it abates as trial approaches.").

Mother's volatile and recurrent relationship with Father further supports the trial court's termination order. That relationship is relevant for two reasons: (1) it exposed the children to violence and (2) it created the conditions for Mother's drug use relapse. *See In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("[A] parent's failure to remove himself and his children from a violent relationship endangers the physical and emotional well-being of the children."); *In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—Dallas 2011, no pet.) (evidence of father's violence in the home supported termination of mother's rights under subsections (D) and (E)); *C.R.*, 263 S.W.3d at 373 (evidence was legally and factually sufficient to support termination where mother had long history of drug use, continued to use drugs after the children's removal, and allowed children to be around father when father was under the influence).

Mother denies that there was a history of family violence, but the evidence does not support her.[12] Mother testified the January 31, 2019, incident in which

---

[12] We find instructive that for the purpose of SAPCRs, "family violence" is defined to include not only physical harm, but also drug use in a manner that causes physical, mental, or emotional injury to a child. Under section 101.0125, "'Family violence' has the meaning assigned by Section 71.004." TEX. FAM. CODE ANN. § 101.0125. Section 71.004 defines "Family Violence" in pertinent part as: (1) "an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself;" and (2) "abuse, as that term is defined by Sections 261.001(1)(C), (E), (G), (H), (I), (J), (K), and (M), by a member of a family or household toward a child of the family or household." *See id.* § 71.004(1), (2). The laundry list in subsection (2) references section 261.001, and the relevant

–20–

Father grabbed the steering wheel occurred when she and Father were arguing. On at least two other occasions, Father's presence resulted in physical violence: once with Mother's eldest son after Mother snuck Father into the home, and another time when Father got into a fight in the front yard with the seventeen-year-old son of one of Mother's friends. After the first incident, the department became involved and A.O. was removed from Mother's care. A.O. reported to Shipley that she was "worried that [Mother] would do drugs again, that she would let [Father] back in the home, that they would be fighting again, [and] that she [would] end up back in foster care." Hays testified that A.O. was afraid that if Father came back home, he "might hit her." On this record, we conclude the trial court could reasonably form a firm belief or conviction that Mother's acts and omissions exposed the children to family violence.

Further evidence of Mother's endangering conduct included Mother's involvement of A.O. in criminal activity. A.O. recounted to her social worker that Mother would encourage her to steal at Walmart. A parent's own criminal activity can support a finding of endangerment. *See In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021). A parent's encouragement of criminal activity in children can also endanger their emotional and physical well-being. *See In re H.H.*, No. 2-05-093-CV, 2006 WL

---

provision for our analysis is: (I) current use of a controlled substance in a manner that results in physical, mental, or emotional injury to a child. *See id.* § 261.001(1)(I).

.

176858, at *4 (Tex. App.—Fort Worth Jan. 26, 2006, no pet.) (mem. op.) (evidence that father encouraged criminal behavior in his child supported termination).

On this record, we conclude that the evidence—including Mother's history of drug use, Mother's continued drug use after removal, the children's exposure to family violence, and Mother's involvement of the children in criminal activity—was legally and factually sufficient to support termination under subsections (D) and (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).

## B.     Best Interest of the Children

In addition to the statutory predicates, the department was required to prove by clear and convincing evidence that termination is in the best interest of the children. TEX. FAM. CODE ANN. § 161.001(b)(2). In *Holley v. Adams*, the supreme court recognized nine non-exhaustive factors pertinent to a trial court's best-interest finding. 544 S.W.2d 367, 371–72 (Tex. 1976). These include: (i) the desires of the child; (ii) the emotional and physical needs of the child now and in the future; (iii) the emotional and physical danger to the child now and in the future; (iv) the parental abilities of the individuals seeking custody; (v) the programs available to assist these individuals to promote the best interest of the child; (vi) the plans for the child by these individuals or by the agency seeking custody; (vii) the stability of the home or proposed placement; (viii) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (ix) any excuse for the acts or omissions of the parent. A best interest finding need not be

–22–

supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety. *See C.H.*, 89 S.W.3d at 27. Evidence of section 161.001(b)(1) termination grounds may also be probative of a child's best interest. *See id.* at 28.

### 1.    *Desires of the children*

We first consider the children's desires. *See Holley*, 544 S.W.2d at 371–72. If there is no direct evidence of a child's desires, a factfinder may infer the child's desires from the other evidence admitted at trial. *See In re C.C.*, No. 05-20-01056-CV, 2021 WL 1573062, at *6 (Tex. App.—Dallas Apr. 22, 2021, pet. denied) (mem. op.).

At the time of trial, A.O. was ten years old and C.O. was four. There was no evidence of C.O.'s desires, and the evidence regarding A.O.'s desires was inconsistent. Thomas testified that, after she took over the case in 2021, A.O. expressed a desire to move back in with Mother. Thomas further testified that A.O. was excited to see Mother for visitations. However, Hays testified that A.O. "said from the very beginning that she wanted to be adopted." Monsivais similarly testified that A.O. reported wanting to be adopted by her foster parents. Shipley testified that A.O. began asking about adoption as early as November 2019. Given the lack of evidence as to C.O.'s desires and the conflicting evidence as to A.O.'s desires, we conclude this factor weighs neither in favor of nor against termination of Mother's parental rights.

### 2. The emotional and physical needs of the children, emotional and physical danger to them, parental abilities of the person seeking custody, and acts or omissions of the parent indicating lack of proper parent-child relationship

Next, we consider together the second, third, fourth, and eighth *Holley* factors. *See In re D.D.*, No. 05-18-00793-CV, 2018 WL 6381541, at *6 (Tex. App.—Dallas Dec. 3, 2018, no pet.) (mem. op.) (considering these factors together). A parent's criminal activity, continued drug use, and refusal to submit to drug testing after removal are significant factors that the factfinder may weigh in determining whether termination is in the children's best interests. *See Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *see also D.D.*, 2018 WL 6381541, at *6 ("Mother's drug use 'posed a very real danger' to the children." (quoting *In re O.R.F.*, 417 S.W.3d 24, 40 (Tex. App.—Texarkana 2013, pet. denied)). The continued use of drugs after removal also demonstrates a lack of parental abilities. *See In re B.L.H.*, 609 S.W.3d 271, 281 (Tex. App.—Texarkana 2020, pet. denied).

As detailed above, Mother has an extensive history of drug use. Although Mother claimed to have been clean from 2006 to 2019, there was evidence to contradict her testimony. A.O. reported that on at least one occasion, Mother was passed out for three days from drug use, leaving A.O. to care for herself and C.O. She also reported feeling "so scared" when Mother would take her to buy drugs and leave her in the car while Mother went into the drug house. A.O. further reported that she "felt guilty" and believed she "was a bad person" because Mother involved

–24–

her in shoplifting. During an October 2020 visitation, A.O. informed Mother of A.O.'s desire to be adopted, which, as Mother testified, caused her to relapse and use methamphetamines. On numerous other occasions, Mother missed her drug test appointments or refused to provide samples upon learning she would be observed. Although Mother successfully completed her drug abuse counseling with Crow on April 8, 2021, Mother did not appear to her scheduled tests in April and May. The trial court could infer from these missed tests that Mother had continued to use drugs after her therapy had ended. *See C.R.*, 263 S.W.3d at 372.

The evidence that Mother's conduct was dangerous to the children's emotional and physical well-being was overwhelming. In July 2020, during family therapy sessions with Mother, A.O. expressed her fear that Mother would let Father back into the home. Hays testified that A.O. was "afraid that [Father] might hit her." A.O. reported to Samuel how scared she was when Mother and Father were fighting when she was in the car and Father grabbed the steering wheel.[13] A.O. was also concerned that, if she were returned to Mother's care, Mother would use drugs again and A.O. and C.O. would be back in foster care. A.O. grew dissatisfied with Mother's progress in therapy and began refusing to attend visitations with her. Later in July 2020, the parties engaged in mediation, but no agreement was reached. A.O. reacted extremely negatively to the failed mediation. In one incident, A.O. put a

---

[13] Samuel testified that A.O. also "mentioned the domestic violence in the house between [Father] and [Mother]." Other than the incidents we detailed above, the record does not reveal any other specific incidences of family violence.

knife to her throat and threatened suicide. In another, she put a bag over her head. A.O. was hospitalized and diagnosed with depression, for which she was prescribed antipsychotic medication. Mother argues that A.O.'s depression was the result of being in foster care. Shipley disagreed, however, saying A.O. never verbalized wanting to return to Mother's care. Rather, Shipley said that A.O. was frustrated that the case was dragging out and "wanted the case to be over."

We conclude that the evidence was legally and factually sufficient for the trial court to form a firm belief or conviction that Mother's history of drug abuse, neglect of the children as a result of drug use, continued exposure to violence and instability through her toxic relationship with Father, and involvement of A.O. in criminal activity posed a physical and emotional danger to the children and demonstrated poor parental abilities and a lack of a proper parent-child relationship. These factors weigh heavily in favor of termination.

### 3. *Programs available to promote the children's best interests*

The fifth *Holley* factor requires trial courts to consider programs available to assist these individuals to promote the best interest of the child. *See Holley*, 544 S.W.2d at 371–72. Here, Mother agreed to the service plan, which included individual therapy, group counseling, family therapy, and drug counseling. Mother completed her group counseling in June 2019, but Parides discharged Mother in April 2021 for failing to attend the sessions. Mother completed her drug counseling with Crow in April 2021 but failed to appear for scheduled drug tests in April and

May 2021. The service plan required Mother to seek inpatient treatment in the event she relapsed and used drugs during the pendency of the termination proceedings. Mother relapsed at least three times but did not seek inpatient treatment. The plan also required Mother to maintain stable employment and housing, and to obtain a driver's license. There was no negative evidence of failure to maintain stable employment, and while Samuel testified that Mother's apartment is a concern because "it's a one-bedroom apartment and Mother has two kiddos," that fact did not appear to raise the specter of instability. Mother failed to obtain a driver's license. In fact, Mother testified that, at the time of trial, she had a case pending after being cited for "no driver's license and driving without insurance."[14]

We conclude the evidence was legally and factually sufficient for the trial court to form a firm conviction or belief that Mother had failed to take advantage of the programs available to promote the children's best interest. This factor weighs in favor of termination.

### 4. Plans for the children and stability of the children's proposed placement

We next consider the sixth and seventh *Holley* factors. We are mindful that "permanence is of paramount importance in considering a child's present and future needs." *See Dupree*, 907 S.W.2d at 87. The department plans to place the children with an adoptive family. At the time of trial, the children were placed in therapeutic

---

[14] The record does not contain any filings from this proceeding.

foster care, a program in which the foster parents have training to help support children with extensive trauma. However, Monsivais testified that the therapeutic foster family was not "adoption-motivated." Monsivais agreed that a permanent adoption was in the children's best interest. She further testified that there is nothing that makes A.O. unadoptable, and she believes A.O. will thrive in an adoptive placement. Shipley testified that the children need "permanency, stability" and "to be able to settle and attach." Thomas testified that the permanency goal of termination and subsequent adoption was appropriate.

We conclude that the evidence was legally and factually sufficient for the trial court to form a firm conviction or belief that the department's permanency plan was in the children's best interest. *See In re D.V.*, 480 S.W.3d 591, 603 (Tex. App.—El Paso 2015, no pet.).

### CONCLUSION

We conclude that the evidence was such that the trial court could have reasonably formed a firm belief or conviction that (1) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being; and (3) termination of Mother's parental rights is in the children's best interest.

We affirm the trial court's order of termination.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

210789F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF A.O. AND
C.O., CHILDREN

No. 05-21-00789-CV

On Appeal from the County Court,
Kaufman County, Texas
Trial Court Cause No. 101811CC.
Opinion delivered by Justice
Goldstein. Justices Molberg and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered March 3, 2022.